**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sabrina Ramirez, | No. CV-17-01714-PHX-DMF |
| Plaintiff, | |
| v. | **MEMORANDUM AND ORDER** |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Plaintiff Sabrina Ramirez ("Claimant") appeals the Commissioner of the Social Security Administration's decision to adopt Administrative Law Judge Randolph E. Schum's ("ALJ"'s) ruling denying her application for Disability Insurance Benefits under Title II of the Social Security Act. (Doc. 1 at 1-2)[1] Claimant argues that the ALJ erred by improperly: (1) rejecting treating physician opinions and according only partial weight to the consultative examiner's opinion; (2) listing jobs in excess of her Residual Functional Capacity ("RFC"); and (3) finding her pain symptom testimony only partially credible. (Doc. 15 at 18-24) She urges that her case be remanded to the Commissioner for an award of benefits. (*Id.* at 24-26) The Commissioner has filed a responsive brief (Doc. 17), and Claimant has filed her reply (Doc. 18).

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and with the parties' consent to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c). For the reasons

---

[1] Cites are to documents as docketed in the Court's electronic court filing system.

set forth below, the Court will vacate the Commissioner's final decision and will remand for further administrative proceedings.

## I.     BACKGROUND

### A.     Application and Social Security Administration Review

Claimant was 44 when she filed her application for disability benefits on April 21, 2015, alleging a disability onset date of February 17, 2012. (Doc. 14-3 at 20, Doc. 14-6 at 2) Claimant asserted diagnoses of physical and mental conditions, including ankylosing spondylitis, human leukocyte antigen (HLA)-B27 positive, arthritis, myasthenia gravis, depression, anxiety, and post-traumatic stress disorder ("PTSD"). (Doc. 14-7 at 8)

Claimant's application was initially denied by the state agency on August 3, 2015 (Doc. 14-4 at 41-42), and again upon reconsideration on December 30, 2015 (*Id.* at 62-63). The ALJ conducted a hearing on Claimant's application on November 29, 2016. (Doc 14-3 at 67-86) The ALJ filed a notice of an unfavorable decision on February 24, 2017. (*Id.* at 17-31) Claimant requested review by the Appeals Council (*Id.* at 16), which was denied on April 26, 2017. (*Id.* at 2-4) At that point, the Commissioner's decision became final. *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1162 (9th Cir. 2012).

In his decision, the ALJ explained that Claimant had filed a prior application for disability insurance benefits and supplemental security income benefits on July 26, 2012. (Doc. 14-3 at 20) The ALJ had also adjudicated Claimant's 2012 application, and had entered an unfavorable decision on January 6, 2015. (Doc. 14-4 at 2-17) The ALJ noted that the Appeals Council denied review of his prior decision on March 23, 2015, and that the prior decision "remains final and binding and *res judicata* applies with regard to the period through the date of this decision." (Doc. 14-4 at 20) The ALJ further noted that an "unadjudicated period" existed, raising a presumption of continuing non-disability. (*Id.*) However, the ALJ found that Claimant had successfully rebutted the presumption by demonstrating "an increase in the severity of [her] impairments and the existence of additional impairments." (*Id.* at 21) The ALJ determined that because "new and material" evidence regarding Claimant's disability had been introduced, he was not required to

adopt the findings of his prior decision. (*Id.*) He found no basis to reopen the prior decision, and stated he would only consider a period of disability beginning on January 7, 2015, the day following the date of his prior decision. (*Id.*) Under this circumstance, the onset date of disability is January 7, 2015.

**B.    Relevant Medical Treatment**

*1.    East Valley Pulmonary Associates/ Radiology reports*

Claimant underwent imaging of her chest area on February 14, 2012, which identified "noncalcified nodular densities" in her lung. (Doc. 14-8 at 31) She was seen by Dr. Firas Joudeh in July 2015, who noted multiple nodules. (*Id.* at 83-85) In August 2015, Claimant continued to take antifungal medication and reported feeling better. (Doc. 14-11 at 158) Subsequent imaging indicated her nodules were stable. (*Id.* at 179) In September 2016, Dr. Joudeh reported that, in addition to pulmonary nodules due to coccidioidomycosis (Valley Fever), Claimant had been diagnosed with chronic airway obstruction, and asthma. (Doc. 14-12 at 22) Dr. Joudeh documented that Claimant reported feeling better, was not suffering shortness of breath, but had coughing and phlegm. (*Id.* at 23) The doctor observed that Claimant's asthma was "likely due to the [p]arrot and cat she has at home[;]' but that she was "not willing to give them up a[s] they help her son with his Autism." (*Id.* at 24) In November 2016, Claimant reported excessive sleepiness and fatigue. (Doc. 14-15 at 53) Dr. Joudeh recommended that Claimant continue to take antifungal medication, inhale Albuterol as needed, take other asthma medication as prescribed, and obtain a sleep study for possible sleep apnea as soon as possible. (*Id.* at 54)

*2.    Ophthalmic Surgeons & Physicians*

The record includes Claimant's eye care for the period between February 2012 and December 2014. (Doc. 14-8 at 56-168) Her records indicate Claimant had undergone cataract surgery in her left eye, but was complaining that the "glasses she got after cataract surgery did not work for her." (*Id.* at 78, 96) In October 2014, Claimant underwent successful cataract surgery in her right eye. (*Id.* at 163-164)

### 3. *Maricopa Integrated Health Systems, Dr. Sheetal Chhaya*

In August 2014, an MRI of Claimant's lumbar spine indicated "no MRI evidence of ankylosing spondylosis of the lumbar spine," and the presence of "L3-L4 and L5-S1 central disc protrusions without significant spinal canal or neural foraminal narrowing." (Doc. 14-9 at 2) An MRI was also conducted on Claimant's pelvic region, and indicated "[b]ilateral sacroiliac joints are unremarkable. Specifically, [there is] no inflammatory signal or bone marrow edema. No evidence of acute fracture or suspicious osseous lesion." (*Id.* at 4)

Beginning in May 2014, Claimant was treated by Dr. Sheetal Chhaya, D.O. (*Id.* at 7, 40) Dr. Chhaya's September 2014 notes indicate that Claimant had been diagnosed with myasthenia gravis and with symptoms of a drooping eyelid and difficulty swallowing, and that she had been treated and was doing well. (*Id.*) Dr. Chhaya noted Claimant's report of pain in her elbows, knees, shoulder girdle, hip girdle, and wrists. (*Id.*) Claimant stated that it hurt to stand and that most of her pain was in her back. (*Id.* at 8) In January 2015, Claimant reported that her knee and ankle pain was improved, but that she still suffered lower back and hip pain. (*Id.* at 15)

When Claimant was seen by Dr. Chhaya in July 2015, the doctor noted she complained of jaw pain, especially in the morning. (Doc. 14-11 at 182) In August 2015, Dr. Chhaya recorded that Claimant reported worsened pain in her right knee, and left hip, and that the pain radiated down her left leg. (*Id.* at 187) The doctor indicated that Claimant was using a walker to get around, and that her pain was mainly in her legs. (*Id.*) Later in August 2015, Claimant received an injection of steroid in her left greater trochanter bursa. (*Id.* at 189) In December 2015, Claimant's legs were noted to be swollen, and she reported that leg pain awoke her. (*Id.* at 193) In August 2016, Claimant was injected with a steroid in her left shoulder. (Doc. 14-14 at 41) Also in August 2016, Claimant received three injections of Humira (an immunosuppressant drug). (*Id.* at 44) She rated her baseline pain as 4 out of 10, and overall felt "improved in terms of pain and function." (*Id.*) Dr. Chhaya planned to continue to treat with Humira, because Claimant

"seemed to be doing well on it and will require [a] longer time to see maximal effect." (*Id.* at 45)

### 4. *Associated Internists of Ahwatukee*

In March 2014, Claimant was seen by Lana Turk, M.D. for an initial appointment, and complained of not feeling well, having decreased energy, and sleeping poorly. (Doc. 14-10 at 27) Claimant reported joint pain, depression and anxiety. (*Id.* at 28) Dr. Turk referred Claimant to a neurologist and to a rheumatologist. (*Id.* at 29) In August 2014, Claimant complained of tiredness and fatigue. (*Id.* at 13) In January 2015, Claimant presented with sudden onset shortness of breath and numbness in her hands. (*Id.* at 8) In June 2015, Claimant reported she had neck tenderness and chronic diarrhea. (*Id.* at 104-105) She was referred to a gastroenterologist. (*Id.* at 105) Dr. Turk, her primary care physician, noted that Claimant had been in the hospital for several days in August 2015 for treatment of Valley Fever and C-diff. (*Id.* at 102) In September 2015, Claimant's examination notes indicated she complained of fatigue and tiredness and chronic joint pain. (*Id.* at 100) In November 2015, she was seen for pain and swelling in her legs around her knees and thighs. (*Id.* at 95-97)

In January 2016, she presented for a hospital follow up, and stated that she still "had the C-diff." (Doc. 14-15 at 7) The examination notes indicated that she felt "well with minor complaints." (*Id.*) Dr. Turk reported that "Patient has many issues, and I told her that she is too complicated for me. It doesn't seem that she's doing better with any of her problems so I recommended switching to another PCP [and] maybe she can get satisfied better[;] she would like to see Dr. Woods." (*Id.* at 8)

In March 2016, Dr. Alexis Woods, M.D. saw Claimant, who complained of tiredness and shortness of breath after having pneumonia. (*Id.* at 9) Dr. Woods documented that Claimant reported being "sexually assaulted allegedly in the parking lot of a casino" in February 2016. (*Id.*) Dr. Woods noted that Claimant was generally "feeling well," but had a cough, and reported decreased exercise tolerance and difficulty breathing on exertion. (*Id.* at 10) In June 2016, Claimant said her right leg sometimes swelled. (*Id.* at 20) She also complained of anxiety, depression, joint pain and stiffness.

(*Id.* at 21) In September 2016, Claimant reported sinus issues. (*Id.* at 24) She was noted to have a deviated septum, and Dr. Woods referred her to an otolaryngologist. (*Id.* at 25-26) In October 2016, Claimant presented for a medication review, and complained that her fingertips "are very sensitive [and] seem wrinkled to her." (*Id.* at 17) Dr. Woods indicated that Claimant was feeling well, did not complain of fatigue or cough, but reported anxiety. (*Id.*)

### 5. *Barrow Neurological Institute*

Claimant was examined by Dr. Kumaraswamy Sivakumar at the Barrow Neuromuscular Research Center in 2012. (Doc. 14-8 at 15-20) Dr. Sivakumar concluded that Claimant's medication was "adequate to control the myasthenic symptoms of ptosis." (*Id.* at 16) In August 2012, the doctor performed electrodiagnostics on Claimant and concluded it was a "normal study" and that there was "no evidence of a myopathy or neurogenic process." (*Id.* at 20) Dr. Sivakumar saw Claimant again in April 2014. (Doc. 14-8 at 52-53) The doctor noted that Claimant had reported severe fatigue, "hand weakness with fine objects," and that she was anxious and depressed. (*Id.* at 52) The doctor observed "give way weakness in proximal muscles of the upper and lower extremities," "potentially . . . some fatigability," "no true muscle weakness," and normal reflexes and sensation. (*Id.*) Dr. Sivakumar concluded that Claimant's myasthenia gravis symptoms in her eyes had improved and that her difficulties with swallowing were better. (*Id.*) Claimant was examined by the doctor in February 2015. The examination notes were unchanged from those of previous visits, other than documenting some changes in medication. (Doc. 14-9 at 94-95) When Claimant was again seen by Dr. Sivakumar in January 2016, he recorded virtually identical impressions as he had on previous appointments. (Doc. 14-12 at 19-20)

### 6. *Jewish Family & Children's Services (mental health care)*

Claimant was seen at this provider between August 2014 and September 2016. (Doc. 14-10 at 30-67, Doc. 14-14 at 47-110) At her initial visit in August 2014, her mental status evaluation was normal for all factors, except for her "depressed mood." (Doc. 14-10 at 34) Claimant explained that single parenting was stressful, and reported

difficulty breathing and having some effects from deterioration of her spine. (*Id.* at 35) She described symptoms associated with panic attack, and reported having felt depressed her entire adult life. (*Id.*) Claimant stated that she had been in an emotionally and sexually abusive relationship, was diagnosed in 2006 with PTSD, and had been on medications since then. (*Id.* at 44) She reported that prescriptions for Xanax and Ativan had worked well for her in the past. (*Id.* at 45) In October 2014, her mental status exam was normal, except that her mood was "sad." (*Id.* at 47)

Notes from appointments between December 2014 and March 2015 indicate that Claimant: continued to feel anxious when she was too busy, and was seeing a therapist weekly (*Id.* at 65); had adjustments to her mood medications (*Id.* at 53, 57, 61); and experienced some variability in her mood (*Id.* at 53, 57). At an appointment in April 2015, Claimant reported that she experienced fewer crying spells, and was sleeping deeply but was still fatigued. (*Id.* at 49) Her counselor and she agreed that she was more "burned out than depressed today." (*Id.*) In June 2015, Claimant reported doing "ok" with her depression, and complained of sleeping through the night but not feeling rested. (Doc. 14-14 at 100) In August 2015, Claimant said she was "doing well with a stable mood on current medications." (*Id.* at 96) She had been in the hospital with Valley Fever, and then "contracted C-diff." (*Id.*) She estimated she suffered anxiety attacks once every 20 days. (Doc. *Id.* at 109) In November 2015, she reported sleeping about six hours a night, and stated that her medications were working well. (*Id.* at 92) Her mental status exam was documented as normal, except for an "anxious" mood. (*Id.* at 93)

Claimant's notes from an appointment in February 2016 reported that she had been sick with Valley Fever, and believed this was "the beginning of the downward slide, medically speaking." (*Id.* at 88) Her mental status exam scores were generally normal, but her memory, insight, judgement and concentration were all rated as "fair." (*Id.* at 89) In March 2016, Claimant said she was "not well," and explained that she had been sexually assaulted, but did not report it to authorities because the "man is claiming that the sexual encounter was consensual." (*Id.* at 84) She described feeling "a lot of panic" and noted that the day of her appointment was the first day she had left her house. (*Id.*)

She agreed to an increase in her prescription for Prazosin to treat her nightmares. (*Id.*) Her mental status exam reported "fair" eye contact, appetite, fund of knowledge, insight and judgement. (*Id.* at 86) In April 2016, Claimant stated that her symptoms had been "all over the place" due to her pain. (*Id.* at 80) She also indicated she was stressed because of the demands of dealing with her autistic son, and a pending court case in the matter of her assault. (*Id.*) Her mental status exam was normal. (*Id.* at 82) In June 2016, she had made progress dealing with her assault, but still found it difficult to leave the house. (*Id.* at 76) She reported having "okay days and then I have really bad days." (*Id.*) Her mental status exam was primarily normal, except that her memory was rated as "fair." (*Id.* at 77-78)

In August 2016, Claimant said she was upset with the way the investigation was handled in her assault case. (*Id.* at 72) She reported also being stressed by a pending foreclosure and her pending application for disability benefits. (*Id.*) She rated her depression as "mild" and her anxiety as "at times, pretty bad," but felt that with her current medication regimen, she could "get through this." (*Id.*) Her mental status examination was normal, except her mood was rated as "dysphoric," and her sleep as "fair." (*Id.* at 74) By October 2016, Claimant reported that things were going well, her anxiety symptoms were improved to the point that she said her anxiety was "mild to moderate," and her depression was "mild to none." (*Id.* at 68)

### 7. *Hospital stays and emergency room visits*

From August 6 through 12, 2015, Claimant was hospitalized for symptoms of Valley Fever and C-diff. colitis. (Doc. 14-11 at 37-76, 96-153) The exam notes indicated that her case was complicated due to medications that suppressed her immune system. (*Id.* at 57) Upon discharge, she exhibited a normal range of motion, with normal coordination. (*Id.* at 52) On September 18, 2015, Claimant returned to the hospital after she suffered a recurrence of C-diff. colitis and her diarrhea symptoms had worsened. (*Id.* at 19-36) She was treated with oral antibiotics, and discharged with a two-month tapering dose of antibiotic. (*Id.* at 22) Claimant again presented at the emergency room on November 6, 2015, complaining of right leg swelling and pain. (*Id.* at 10-18) After ruling out deep vein thrombosis, the hospital released Claimant with pain medications. (*Id.* at

14) She returned to the emergency room on November 12, 2015, complaining of diarrhea. (*Id.* at 2-9) Her physical examination was entirely normal, including findings that her back was "nontender, [with] normal range of motion, [and] normal alignment," and that she exhibited overall normal range of motion, and no tenderness. (*Id.* at 4) Her lab work was "completely normal." (*Id.* at 5) She tested negative for C-diff. (*Id.* at 8) She was released with educational materials. (*Id.* at 5)

Claimant was taken to the hospital following her sexual assault on February 14, 2016, and was released after approximately four hours. (Doc. 14-13 at 2-123) She had been transported to the emergency room by ambulance after being found in a casino parking lot, partially disrobed, and alleging she had been sexually assaulted. (*Id.* at 63) She appeared to be intoxicated. (*Id.*) After treatment and interviews with law enforcement, she was released with information to help her cope with her assault, with contact information for victim services, as well as with information on alcohol intoxication, soft tissue contusions and abrasions. (*Id.* at 64, 110-116)

### 8. Radiology

An MRI was conducted of Claimant's lumbar spine in October 2012, which indicated "[s]mall central or paracentral disk protrusions from L3-4 through L5-S1," and "[n]o disk extrusion or significant stenosis." (Doc. 14-8 at 35)

While Claimant was hospitalized in August 2015, her lumbar spine was imaged. (Doc. 14-11 at 75) The MRI indicated: mild loss of disc height at L3-L4 and mild disc desiccation at L3-L4 and L5-S1; other disc heights "relatively well maintained"; a "small central disc protrusion without neural impingement" at L3-L4; "minimal irregular diffuse disc bulge" and "mild bilateral degenerative facet arthrosis" at L4-L5 without "significant narrowing of the central spinal canal, lateral recesses or neural foramina"; a "mild diffuse disc bulge[,] [s]mall central disc protrusion with enhancing annular tear[,]" and "[m]oderate bilateral degenerative facet arthrosis" at L5-S1, with no "central spinal stenosis or lateral recess narrowing" and "[m]ild to moderate neural foraminal narrowing bilaterally." (*Id.*) This imaging revealed no "evidence of ankylosing spondylitis." (*Id.* at 76) Imaging was performed on Claimant's sacroiliac joints, which appeared

"unremarkable in appearance," with no sclerosis, erosions or effusions, and no osteolytic or osteoblastic lesions. (*Id.* at 72)

In December 2016, Claimant underwent an MRI of her right knee. (Doc. 14-15 at 55) Impressions from imaging included: intact ligaments; no meniscal tear; Grade 2 medial compartment chondromalacia; Grade 2-early Grade 3 chondromalacia patella femoral trochlear groove; small knee joint effusion; ruptured Baker's cyst; and intact extensor mechanism; no "significant atrophy," no suggestion of "denervation-type injury"; and no "high-grade musculotendinous injury." (*Id.*)

### 9. Discover Vein and Vascular Center

Claimant was first seen by Dr. Joseph Vijungco on July 18, 2016 for pain, swelling, and bruising of her legs. (Doc. 14-12 at 38) Testing revealed moderate venous reflux in her legs. (*Id.* at 36) During a September 2016 visit, the doctor observed no "evidence of swelling of the legs," and documented a normal physical exam, including normal gait, balance and coordination. (*Id.* at 31) The testing indicated normal blood flow to both legs and no evidence of significant arterial disease. (*Id.*) The doctor stated he would initiate non-operative therapy for her moderate venous reflux, including the use of compression stockings, exercise, weight loss, and leg elevation. (*Id.*)

### 10. Chandler Endoscopy Center

In Claimant's initial visit with Dr. Adam Lowe, the doctor discussed a number of her complaints, including abdominal pain, nausea, difficulty swallowing, anxiety and depression, diarrhea, and bloating, and determined that a colonoscopy may identify root causes. (Doc. 14-12 at 51-58) Claimant's physical examination was normal, including observations of normal posture and gait, normal strength, full range of motion in all joints, and normal mood and affect, attention span and concentration. (*Id.* at 53-54) Claimant underwent an endoscopy and a colonoscopy in September 2016. (*Id.* at 45-50) The colonoscopy returned normal results for the entire colon. (*Id.* at 45-46) Biopsies were taken for evaluation of microscopic colitis. (*Id.* at 45) Similarly, Claimant's endoscopy was normal, and biopsies were taken for histology and for evaluation of celiac disease.

(*Id.* at 49) Testing of biopsies from both the endoscopy and the colonoscopy procedures indicated unremarkable results. (*Id.* at 43-44)

### 11. *Valley ENT, P.C.*

Claimant was seen by Maulik Shah, M.D. in September 2016 for sinusitis and nasal congestion. (Doc. 14-12 at 61-63) Dr. Shah performed a nasal endoscopy and identified a deviated nasal septum, sinus infection, and a narrow right passageway. (Doc. 14-12 at 62) Dr. Shah recommended surgical correction. (*Id.* at 62-63) Claimant testified at her hearing the she had undergone the surgery on November 1, 2016. (Doc. 14-3 at 71)

### C. **Medical Assessment forms**

### 1. *Sheetal Chhaya, D.O.*

On February 17, 2016, Dr. Chhaya completed a "Physical Residual Functional Capacity Questionnaire." (Doc. 14-12 at 11-15) The doctor identified Claimant's diagnosis as ankylosing spondylitis, which she characterized as chronic, and the cause of pain, decreased mobility, fatigue and depression. (*Id.*) She reported that Claimant complained of constant hip pain with a severity of 10 out of 10. (*Id.*) She described Claimant's treatment as "immunosuppression" and listed side effects as "increased risk of infection, and she has repeated hospitalizations for C-diff. and Valley Fever." (*Id.*) Dr. Chhaya indicated that Claimant's pain was "constantly" severe enough to "interfere with attention and concentration needed to perform even simple work tasks." (*Id.* at 12) The doctor opined that Claimant was incapable of even low stress jobs. (*Id.*) She estimated that Claimant could sit or stand for only 15 minutes at one time before needing to stand up or sit down. (*Id.*) She concluded Claimant could sit or stand/walk for less than 2 hours in an 8-hour work day. (*Id.* at 13) The doctor indicated that Claimant needed to walk around every 10 minutes for a period of 10 minutes. (*Id.*) She also stated that Claimant would need to be able to shift at will from sitting, standing, or walking, and would need to take 5 to 6 unscheduled 10-minute breaks each work day. (*Id.*) Dr. Chhaya opined that Claimant would not need to elevate her legs with prolonged sitting, and did not require a cane or other assistive device. (*Id.*)

The doctor indicated that Claimant could only "rarely" lift and carry an object less than 10 pounds, and only occasionally look down, turn her head, look up or hold her head in a static position. (*Id.* at 14) She stated that Claimant could only "rarely" twist, stoop, crouch or squat, climb ladders or climb stairs. (*Id.*) Dr. Chhaya opined that Claimant could reach bilaterally for only 50 percent of a work day with either arm. (*Id.*) She suggested that Claimant would miss work more than 4 days each month because of her impairments or for treatment. (*Id.*)

In April 2016, Dr. Chhaya wrote a brief letter stating that Claimant had been diagnosed with Undifferentiated Spondyloarthropathy and degenerative disc disease, along with intermittent swelling and pain in her peripheral joints. (Doc. 14-12 at 16) The doctor noted that Claimant had trouble walking and sitting for prolonged periods, and opined that these symptoms would preclude her from employment. (*Id.*)

### 2.    Dr. Firas Joudeh

On November 23, 2016, Claimant's pulmonologist completed a Pulmonary Medical Source Statement. (Doc. 14-14 at 2-6) Dr. Joudeh identified Claimant's symptoms as including shortness of breath, wheezing, rhonchi, episodic acute asthma, episodic pneumonia, fatigue and coughing. (*Id.* at 2) He indicated that the precipitating factors were upper respiratory infection, exercise, emotional upset or stress, and cold air or a change in the weather. (*Id.*) He reported that Claimant suffered one to two asthma attacks each year, and caused her to be incapacitated for a week after each attack. (*Id.*) He estimated that Claimant could walk one city block without rest or severe pain. (*Id.* at 3) Dr. Joudeh opined that Claimant could sit for 2 hours at a time, and stand for 30 minutes at a time. (*Id.*) In an 8-hour day, the doctor believed that Claimant could stand and/or walk for less than 2 hours total, and sit for about 2 hours total. (*Id.*) Further, the doctor stated that Claimant would need to take two unscheduled 15- to 30-minute breaks each day, during which she would have to lie down or sit quietly. (*Id.*) Dr. Joudeh indicated that Claimant would be required to avoid "even moderate exposure" to extreme temperatures, high humidity, wetness, cigarette smoke, perfumes, soldering fluxes,

solvents and cleaners, fumes, odor, gases, dust, and chemicals. (*Id.* at 4) The doctor stated that Claimant would be incapable of even "low stress" jobs. (*Id.* at 6)

### D.   Consultative Examinations Requested by State Agency

#### 1.   *Angel Gomez, M.D.*

Dr. Gomez, a consultative physical examiner for the state agency, examined Claimant on July 9, 2015. (Doc. 14-10 at 86-91) Dr. Gomez reported Claimant's statement that her employer "was unable to accommodate her inability to drive long distances, and she had to leave the job." (*Id.* at 86) The doctor observed that Claimant walked with a normal pace and was able to get on and off the examination table without difficulty. (*Id.* at 87) Dr. Gomez noted that Claimant exhibited a normal gait, but was not able to do a toe walk "because of balance and apparent weakness." (*Id.*) She was also not able to perform a heel walk or a tandem walk because of "balance issues." (*Id.*) Dr. Gomez documented that Claimant had "only 50 degrees of forward flexion, 10 degrees of flexion to the right, 15 to the left, 15 degrees of rotation to each side and only 5 degrees of extension." (*Id.*) Dr. Gomez remarked that Claimant's extremities were not tender, that she had normal muscle tone, a full range of motion in her arms and legs, and 4 out of 5 strength rating in all major muscle groups, except that she demonstrated a 5 of 5 in her grip strength and knee extension. (*Id.* at 88) Dr. Gomez concluded that Claimant had a decreased range of motion of her spine, a normal gait, but "overall mild-to-moderate weakness and postural instability," and that she would have difficulty with prolonged activity that required "some level of exertion." (*Id.*)

Dr. Gomez completed a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)." He recognized that Claimant would be subject to limitations for 12 continuous months, including: frequently lifting and/or carrying 10 pounds; and standing and/or walking for a total of 3 hours in an 8-hour work day. (*Id.* at 89) The doctor found that Claimant could: occasionally climb ramps or stairs, kneel, crouch, crawl, and reach; could never climb ladders, ropes, or scaffolds; could never stoop; and could not work around temperature extremes, chemicals, dust, fumes or gases,

or excessive noise. (*Id.* at 90-91) Dr. Gomez found that Claimant had no limitations in her ability to sit. (*Id.* at 90)

### E. Non-examining State Agency Medical Consultant Assessments

#### 1. Elliot Salk, Ph.D. and Nadine Keer, D.O.

The state agency reviewers found Claimant to be "not disabled" on initial review on August 3, 2015. (Doc. 14-4 at 25-42) These reviewers found Claimant incapable of performing her past relevant work, but concluded she retained the RFC to perform less demanding work. (*Id.* at 41) The record reviewed included evidence received as of July 22, 2015. (*Id.* at 27)

#### 2. Rosalia Pereyra Psy.D. and Krishna Mallik, M.D.

On reconsideration, these reviewers considered the record current as of December 18, 2015. (*Id.* at 45-46) The reviewers found no change in circumstances subsequent to the ALJ's January 6, 2015 decision denying disability, and adopted the ALJ's finding of no disability on December 30, 2015. (*Id.* at 59, 62-63)

## II. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this court must affirm the Commissioner's decision to adopt the ALJ's findings if the ALJ's findings are supported by substantial evidence and are free from reversible error. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). "Substantial evidence is more than a mere scintilla, but less than a preponderance." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998). "It is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison v. NLRB*, 305 U.S. 197, 229 (1938)).

In determining whether substantial evidence supports the ALJ's decision, the Court considers the record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusions. *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1988). The ALJ is responsible for resolving conflicts in medical testimony, ambiguity in the record, and determining credibility. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). If there is sufficient evidence to support the ALJ's outcome, the

Court cannot substitute its own determination. *See Young v. Sullivan*, 911 F.2d 180, 184 (9th Cir. 1990). Although the Court "must do more than merely rubberstamp the ALJ's decision[,]" *Winans v. Bowen*, 853 F.2d 643, 645 (9th Cir. 1988), where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be upheld. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989) (citations omitted).

## III.   LEGAL STANDARDS

Claimant bears the burden of proving disability under the Social Security Act. *Tidwell v. Apfel*, 161 F.3d at 601. She meets this burden if she can establish that she has a physical or mental impairment that prevents her from engaging in any substantial gainful activity and that is expected to result in death or to last for a continuous period of at least one year. 42 U.S.C. §§ 423(d)(1) and 1382c(a)(3)(A). Claimant's impairments must be such that she is not only unable to perform her past relevant work, but also that she cannot, considering her age, education and work experience, engage in other substantial gainful work existing in the national economy. 42 U.S.C. §§ 423(d)(2) and 1382c (a)(3)(B). The Commissioner applies a five-step sequential process to evaluate disability. 20 C.F.R. §§ 404.1520 and 416.920. In the first three steps, the Commissioner determines: (1) whether a claimant has engaged in substantial gainful activity since the alleged onset; (2) whether she has a "severe" impairment or a combination of impairments that is "severe"; and (3) whether the severity of any impairment meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R. Pt. 404, Subpt. P, App. 1). *Id.* If a claimant complies with these three steps, she will automatically be found disabled; if that claimant satisfies steps one and two but not three, she must then satisfy step four. *Id.* Before considering step four, the ALJ must assess the claimant's RFC, *see* 20 C.F.R. § 404.1520(a)(4)(iv), which is "the most [the claimant] can still do despite [the claimant's] limitations." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1097 (9th Cir. 2014) (quoting 20 C.F.R. § 404.1545(a)(1)). The RFC assessment is "based on all the relevant medical and other evidence" in the claimant's record. *Id.* (quoting 20 C.F.R. § 404.1520(e)). In determining a claimant's RFC, the ALJ must

consider all of a claimant's medically determinable impairments, including those that are not severe. 20 C.F.R. § 404.1545(a)(2).

At step four, the ALJ considers the claimant's RFC and past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If a claimant is able to perform her past relevant work, she is not found to be disabled. *Id.*

When a claimant satisfies step four, the burden shifts from her to the Commissioner to establish the claimant is capable of performing other work in the national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (a claimant bears the burden of proof on the first four steps, but the burden shifts to the Commissioner at step five). The fifth and final step involves the ALJ's decision whether a claimant is able to make an adjustment to other work, given the ALJ's assessment of the claimant's RFC and age, education and work experience. 20 C.F.R. § 404.1520(a)(4)(v).

## IV.    ADMINISTRATIVE HEARING

The ALJ conducted an oral hearing on Claimant's application on November 29, 2016. (Doc. 14-3 at 67-86) Claimant testified that she was 46, and had obtained a Bachelor degree in counseling with an emphasis in addiction. (*Id.* at 69) She testified that she had been employed as a social worker between 2001 and 2011. (*Id.* at 69-70)

The ALJ noted that Claimant arrived at the hearing using a walker, and asked if a doctor had prescribed the use of a walker or told her she had to use it. (*Id.* at 70) Claimant said that she was "a little unbalanced and weak when I walk[,]" and that she "just use[d] it when [she] fe[lt] unsteady." (*Id.*) The ALJ asked if Claimant was on "some type of respiratory equipment[,]" in reference to breathing apparatus Claimant was wearing, but which was not attached to a tank. (*Id.* at 70-71) Claimant explained that she used it for "asthma and acute bronchial and pneumonia infections" and that she had recently undergone surgery to correct a deviated septum and to address infection. (*Id.* at 71)

Claimant reported she had received psychological care for at least the previous two years for anxiety, depression, "and mostly PTSD," that had worsened. (*Id.* at 72) She reported chronic back pain that affected her entire spine, but was most intense in her tailbone and pelvic area. (*Id.*) She reported she suffered from Valley Fever, and a

disorder of her immune system that was so compromising that she had been hospitalized three times for "lengthy stays" in the past two years. (*Id.* at 72-73) She stated that her medications upset her stomach, and that she suffered from gastrointestinal issues that caused diarrhea which was worse on some days than others. (*Id.* at 73) She also reported suffering from muscle weakness that affected her writing, and resulted in the inability to sit for extended periods of time. (*Id.* at 73)

With regard to her psychological problems, Claimant reported she had been raped and strangled in February 2016, and that the aftermath had "really been very difficult." (*Id.* at 73-74)

On questioning from her attorney, Claimant explained that the State provided attendant care for her disabled son because she was no longer able to cook and clean, do laundry, or provide transportation. (*Id.* at 74) Claimant said she received this care three to four days each week, for five to eight hours each visit. (*Id.*) She reported she had been receiving such care for about two years, and that her sister and her parents were also very helpful, along with her 19-year-old daughter, who had her own car and was able to run errands and help with other things. (*Id.* at 74-75)

Claimant said she tried to avoid driving, and that the longest she could drive before having to stop due to pain was about 20 to 30 minutes. (*Id.* at 75) She explained that her shoulder pain radiated into her arms, that her hands and fingers hurt, and that she could not lift things, even a frying pan. (*Id.* at 75-76) She stated that she had trouble reaching, and could not take pans out of the cupboard because they were too heavy. (*Id.* at 76)

Claimant estimated she could stand or walk for only 10 minutes at a time. (*Id.* at 77) She said that if she had to shop for groceries, she would get around the store in a scooter, and that her son would carry the grocery bags. (*Id.*) She said she was anxious about leaving home, and would imagine she saw her rapist "everywhere I go." (*Id.*) She stated she had recently undergone lung tests and was told her lungs were like those of an 81-year-old. (*Id.* at 78) She complained of suffering from shortness of breath when she was lifting or trying to move something. (*Id.*) She also stated that she experienced

breathing problems during panic attacks, which she said occurred at least three times a week, and lasted about an hour and a half. (*Id.*) Claimant denied sleeping during the day, but said she did need to lie down, and estimated she was lying down for 80% of the day. (*Id.* at 79)

Addressing the Vocational Expert ("VE"), the ALJ described a hypothetical claimant of Claimant's age, education, and work experience, and subject to a number of limitations. (*Id.* at 79-80) The VE concluded that such an individual could not perform Claimant's past relevant work. (*Id.* at 80) The VE testified that the hypothetical claimant would be able to perform other work, including the jobs of document preparer, and addressing clerk. (*Id.*)

Claimant's counsel asked whether limiting the hypothetical claimant to only occasional reaching "in all directions, including overhead" reaching, would alter the VE's conclusions about the jobs available. (*Id.* at 82) The VE opined that neither of the jobs identified would be available in that case. (*Id.*) Counsel asked whether an individual who could sit or stand for only 15 minutes at a time would be able to perform these two jobs. (*Id.*) The VE stated that this individual could not perform the addressing clerk job, and most likely could not perform the document preparer job. (*Id.*) Counsel then described a limitation in which a person would be required to take a ten-minute break five to six times each day, in addition to regular breaks. (*Id.* at 82-83) The VE said that such a person "would probably not be employed." (*Id.* at 83) The VE stated that an individual would not be capable of sustaining full-time employment if she were absent more than four days a month. (*Id.*)

Claimant's attorney asked the VE for additional details about the addresser position, and was told that the work could involve handwriting or computer usage, and that "there's not a lot of jobs out there anymore that do that." (*Id.*) The VE also explained that the document preparer position involved scanning documents, which could be a sedentary job if the scanner were table-sized. (*Id.* at 84)

/ / /

/ / /

## V. ALJ's DECISION

The ALJ issued his unfavorable decision on February 24, 2017. (Doc. 14-3 at 17-31) He found that Claimant met the insured status requirements of the Social Security Act through December 31, 2017, and that she had not engaged in substantial gainful employment since January 7, 2015, the amended alleged onset date. (*Id.* at 23) The ALJ found that Claimant suffered the severe impairments of degenerative changes of the lumbar spine and right knee, obesity, polymyalgia, colitis/C-diff. colitis with intermittent diarrhea, myasthenia gravis, anxiety, and depression. (*Id.*) Additionally, the ALJ discussed the conditions that he determined were non-severe: myogenic ptosis and cataracts. (*Id.*) The ALJ found that Claimant did not "have an impairment or combination of impairments" meeting or medically equaling the severity of a listed impairment. (*Id.* at 23-24)

The ALJ concluded that Claimant maintained the RFC to:

> perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant can lift and carry ten pounds occasionally and less than ten pounds frequently. The claimant is limited to standing and/or walking up to two hours and sitting at least six hours in an eight-hour day. The claimant is limited to occasionally climbing ramps and stairs, but never ladders, ropes, or scaffolds. The claimant is limited to occasionally balancing, stooping, kneeling, crouching, but never crawling. The claimant should avoid concentrated exposure to extreme cold, fumes, odors, dust and gases, unprotected heights, and moving and dangerous machinery. The claimant is able to understand, remember, and carry out simple instructions and tasks. The claimant should not work in a setting which includes constant or regular contact with the general public or more than infrequent handling of customer complaints.

(*Id.* at 25) The ALJ found Claimant was not able to perform her past relevant work as a child welfare caseworker. (*Id.* at 30) However, the ALJ concluded that through Claimant's date last insured, and considering her age, education, work experience and the RFC described above, there were jobs that existed in significant numbers in the national economy which Claimant could perform, including: document preparer, and addressing clerk. (*Id.* at 30-31) Accordingly, the ALJ found Claimant had not been disabled at any

time between her alleged onset date of January 7, 2015, through the date of the decision. (*Id.* at 31)

## VI.    DISCUSSION

As noted, Claimant argues that the ALJ erred by improperly: (1) rejecting the opinion of treating rheumatologist Dr. Chhaya, and according only partial weight to consultative examiner Dr. Gomez's opinion; (2) identifying the job of document preparer, which exceeded her actual Residual Functional Capacity ("RFC"); and (3) finding her pain symptom testimony only partially credible. (Doc. 15 at 18-24)

The Commissioner concedes that the case should be remanded for further administrative proceedings, in part because the ALJ should "obtain vocational expert evidence and determine whether the vocational expert evidence is consistent with the Dictionary of Occupational Titles, pursuant to [SSR] 00-4p. (Doc. 17 at 2)

### A.    Whether the ALJ properly discounted Claimant's symptom testimony

In his evaluation of Claimant's credibility involving her subjective symptoms, the ALJ applied the two-step analysis described in *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)). (Doc. 14-3 at 26) Under this analysis, the ALJ initially "must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* at 1036 (citation and internal quotation marks omitted). If the claimant meets the first test and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Id.* (citation and internal quotation marks omitted). The clear and convincing standard is the most heightened standard in Social Security Law. *Moore v. Soc. Sec. Admin.*, 278 F.3d 920 (9th Cir. 2002). Once an underlying impairment is verified, an ALJ cannot use a lack of full and objective medical corroboration to reject a claimant's subjective symptoms. *Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986), *superseded by statute on other grounds as stated in Bunnell v. Sullivan,* 912 F.2d 1149 (9th Cir. 1990).

To support a finding that a claimant's symptoms are not credible, the ALJ must offer specific findings properly supported by the record in sufficient detail to allow a reviewing court to review the findings for permissible grounds and freedom from arbitrariness. (*Id.*)

After summarizing Claimant's reported pain symptoms, the ALJ stated he had:

> taken into consideration the nature, location, onset, duration, frequency, radiation, and intensity of the claimant's pain, as well as precipitating and aggravating factors; the type, dosage, effectiveness, and adverse side effects of any pain medication; other treatment, other than medication, for relief of pain; functional restrictions; and the claimant's daily activities, and finds that her allegations of disabling pain and limitations are out of proportion with the record.

(Doc. 14-3 at 26) The ALJ cited MRI results indicating "mild to moderate neural foraminal narrowing of L5-S1," a neurological consultation indicating "mild ptosis," and an examination noting no muscle weakness. (*Id.* at 26) The ALJ recognized that some examinations documented lower extremity swelling, some lumbar excursion, reduced range of motion in Claimant's spine and positive Schober test. (*Id.* at 27) He also cited to other examinations in which Claimant demonstrated normal gait and strength, a full range of motion, and good posture. (*Id.*) The ALJ indicated that the objective findings support some of Claimant's alleged limitations, which he said were accounted for in the RFC, including lift and carry weight limitations, the limit on walking and standing, and other limitations addressing her physical restrictions. (*Id.*) The ALJ noted that the record included apparently contradictory evidence, and stated that the RFC accommodated some of Claimant's limitations. (*Id.*)

The ALJ did not meet his burden for rejecting Claimant's symptom testimony, particularly her pain testimony, and failed to provide specific findings properly supported by the record in sufficient detail to allow a reviewing court to review the findings for permissible grounds. For example, he did not explain why the portions of the record suggesting Claimant was not as limited as she reported were more convincing than other portions of the record that supported her alleged degree of limitation. The ALJ did not specifically support his assessment of Claimant's symptom testimony, and this lack of

support rendered his reasons not sufficiently clear and convincing.

**B.     Whether the ALJ improperly discounted the opinions of Dr. Chhaya and Dr. Gomez**

The ALJ's decision summarized Dr. Chhaya's findings from her "Physical Residual Functional Capacity Questionnaire" and brief letter, described in Section I.C.1, above. (Doc. 14-3 at 28) The ALJ concluded that Dr. Chhaya's findings were "considerably incongruent with the available medical evidence." (*Id.*) He stated that the "conditions found are incompatible with the MRI results in the record." The ALJ noted that Dr. Chhaya's conclusion that Claimant's limitations precluded employment was outside Chhaya's area of expertise. (*Id.*) The ALJ also asserted that "the claimant has generally only pursued routine and conservative treatment for her alleged pain symptoms[,]" and found this incompatible with Dr. Chhaya's "significant limited findings." (*Id.*) The ALJ accorded "great weight" to the opinions of non-examining state agency physicians Keer and Mallik that Claimant was not disabled and retained the RFC to perform other jobs. (*Id.* at 29)

A non-examining doctor's opinion is not, standing alone, substantial evidence sufficient to "justif[y] the rejection of the opinion of either an examining physician *or* a treating physician." *Lester v. Chater*, 81 F.3d 821, 831 (9ᵗʰ Cir. 1995) (citation omitted) (emphasis in original). An ALJ, however, can reject a treating physician's opinion that has been contradicted by another doctor's opinion by providing "'specific and legitimate reasons that are supported by substantial evidence.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9ᵗʰ Cir. 2014) (citation omitted). The Ninth Circuit further explained:

> An ALJ can satisfy the "substantial evidence" requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick,* 157 F.3d at 725. "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citation omitted).

> Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs. *See Nguyen v. Chater,* 100 F.3d 1462, 1464 (9th Cir. 1996).

*Id.*

Here, the ALJ specifically cited only the "MRI results" from October 31, 2012 as medical evidence that was "incongruent" with Dr. Chhaya's opinions. (Doc. 14-3 at 28) However, the ALJ failed to discuss any of the specific MRI findings or to explain how the results of this MRI were contradictory to Chhaya's opinions. Accordingly, the ALJ erred in discounting or rejecting these opinions. Moreover, the record includes more recent MRI results from August 2015 that provide updated medical evidence and were more relevant than similar imaging in 2012. (Doc. 14-11 at 75)

Claimant further contends the ALJ improperly assigned only partial weight to the opinion of examining physician Angel Gomez. (Doc. 15 at 19-20) The ALJ concluded that because some physical examinations "indicated some normal physical functioning, such as normal gait," this evidence was inconsistent with Dr. Gomez's conclusion that Claimant would only be able to stand and/or walk for a total of 3 hours in an 8-hour work day. (Doc. 14-3 at 28) The ALJ did not meet his obligation to explain why his interpretation of the evidence, rather than Gomez's, was correct.

Dr. Gomez also concluded that Claimant would be limited to only occasional[2] reaching. Claimant asserts that both the document preparer and addressing clerk positions require frequent reaching, which is defined as "occurring one-third to two-thirds of an 8-hour workday (cumulative, not continuous). (Doc. 15 at 19, Doc. 14-10 at 90) While the ALJ "found no objective evidence to support any limitation of the hands[,]"[3] he did not address the discrepancy between Dr. Gomez's opinion that Claimant could only "occasionally" reach and the requirement of "frequent" reaching in the document preparer and addressing clerk positions. (Doc. 14-3 at 27-28) The ALJ also did not

---

[2] For the purposes of Dr. Gomez's medical source statement, "occasional" is defined as "occurring from very little up to one-third of an 8-hour workday (cumulative, not continuous). (Doc. 14-10 at 90)

[3] Although the Commissioner argues that the ALJ found the medical record did not support Dr. Gomez's limitation on reaching, the ALJ in fact stated there was "no objective evidence to support any limitation of the hands[,]" (Doc. 14-3 at 28), which would directly apply to Gomez's specific limitation to handling and fingering, but not to the limitation on reaching, an act that requires primarily the use of the arms and shoulders.

address, for example, evidence in which Dr. Sivakumar and Dr. Chhaya documented Claimant's "give way" weakness and fatigability, as well as tenderness in Claimant's wrists, fingers and shoulders, which appear to support reaching limitations. (Doc. 15 at 19-20) Accordingly, the ALJ failed to address substantial evidence impacting the correctness of the RFC, and potentially also the applicability of the representative occupations the ALJ identified in his decision.

## C. Whether the ALJ applied an RFC that did not adequately reflect all of Claimant's limitations

Claimant complains that the job of document preparer requires an employee to follow detailed instructions, a requirement that exceeds the RFC identified by the ALJ. (Doc. 15 at 21) The RFC limited Claimant to jobs in which she is "able to understand, remember, and carry out simple instructions and tasks." (Doc. 14-3 at 25) Claimant asserts that where there is a discrepancy between the VE's testimony and the Dictionary of Occupational Titles ("DOT"), the ALJ must reconcile the discrepancy by asking the VE to explain the conflict and assess the explanation before reaching a disability determination. (Doc. 15 at 21) Claimant is correct. The ALJ did not question the VE regarding this discrepancy, and did not discuss it in his decision. The Ninth Circuit has instructed that "SSR 00-4p unambiguously provides that '[w]hen a [VE] . . . provides evidence about the requirements of a job or occupation, the adjudicator has an *affirmative responsibility* to ask about any possible conflict between that [VE] . . . evidence and information provided in the [DOT]." *Massachi v. Astrue*, 486 F.3d 1149, 1153 (9th Cir. 2007). The Commissioner acknowledges the ALJ's error. (Doc. 17 at 2)

## VII. Remand for further proceedings

Claimant urges the Court to remand for an award of benefits, or alternatively for additional proceedings. (Doc. 15 at 24-26) The Commissioner argues in opposition that remand for benefits is not appropriate and asserts that this Court should remand for further administrative proceedings. (Doc. 17 at 5-7)

In the Ninth Circuit, a remand with instruction to award benefits is appropriate if each of three circumstances exist: "(1) the record has been fully developed and further

administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence … ; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014).

A court's decision to remand a disability benefits case to the Social Security Administration for payment of benefits or for further proceedings is discretionary. *Harmen v. Apfel*, 211 F.3d 1172, 1173 (9th Cir. 2000) However, remand for an award of benefits is granted only in "rare circumstances," "where no outstanding issues remain and further proceedings would not be useful" and where "the record, taken as a whole, leaves not the slightest uncertainty as to the outcome of [the] proceeding." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1100-01 (9th Cir. 2014) (citation and internal quotation marks omitted). Instead, generally the court will "remand to the agency for additional investigation or explanation." *Id.* at 1099 (citation and internal quotation marks omitted).

As is discussed above, outstanding issues exist. The ALJ's failure to obtain VE testimony clarifying an apparent conflict between the VE's identification of jobs Claimant could still perform despite her limitations, and information provided in the DOT about those jobs. The ALJ erred in rejecting, without providing legally sufficient reasons, Claimant's pain and other symptom testimony, and in rejecting relevant opinions from Drs. Chhaya and Gomez. Moreover, as the ALJ noted in his decision, the record provides conflicting evidence as to the extent or degree of Claimant's physical limitations, a substantial portion of which also conflicts with Claimant's testimony. The Ninth Circuit has found that "[t]hese are exactly the sort of issues that should be remanded to the agency for further proceedings." *Treichler*, 775 F.3d at 1105. Where "an ALJ makes a legal error, but the record is uncertain and ambiguous, the proper approach is to remand the case to the agency." *Id.* In *Treichler*, the Ninth Circuit cited with approval its earlier decision to remand a case after an ALJ "erred in making inadequate findings to support his conclusion that the claimant was not credible" and to allow "'further findings evaluating the credibility of [claimant's] subjective complaints,' while

noting that on remand the ALJ could deny benefits if he made adequate findings." *Id.* (quoting *Byrnes v. Shalala*, 60 F.3d 639, 642 (9th Cir. 1995)). Further, given conflicting medical evidence in the record, this Court cannot conclude that the record provides "not the slightest uncertainty as to the outcome." *Id.* at 1101.

Accordingly,

**IT IS ORDERED** that the final decision of the Commissioner of Social Security is **VACATED** and this matter is **REMANDED** to the Commissioner for further proceedings consistent with this Order.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment accordingly.

Dated this 22nd day of May, 2018.

Honorable Deborah M. Fine
United States Magistrate Judge